# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

v.

RICHARD ORLAND DAVIS,
                    *Defendant-Appellant.*

No. 07-30219

D.C. No.
CR-04-30061-ALA

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

v.

CYNTHIA JEAN DAVIS,
                    *Defendant-Appellant.*

No. 07-30220

D.C. No.
CR-04-30061-
02-AA

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

v.

JEFFREY ALLEN DAVIS,
                    *Defendant-Appellant.*

No. 07-30226

D.C. No.
CR-04-30061-AA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ann L. Aiken, District Judge, Presiding

Argued and Submitted
May 5, 2008—Portland, Oregon

Filed June 30, 2008

7753

Before: Richard C. Tallman, Richard R. Clifton, and
N. Randy Smith, Circuit Judges.

Opinion by Judge N.R. Smith

**COUNSEL**

Steven Jacobsen, Assistant Federal Public Defender, Portland, Oregon, for defendant-appellant Jeffrey Allen Davis.

Marc Friedman, Eugene, Oregon, for defendant-appellant Cynthia Jean Davis.

Robert M. Stone, Medford, Oregon, for defendant-appellant Richard Orland Davis.

Karin J. Immergut, United States Attorney, District of Oregon; Douglas W. Fong, Assistant United States Attorney, Medford, Oregon, for the plaintiff-appellee.

**OPINION**

N.R. SMITH, Circuit Judge:

On October 22, 2004, law enforcement agents executed a search warrant and raided a large marijuana growing operation on private property in rural Oregon belonging to Jeffrey and Cynthia Davis. While officers were executing the search warrant on the Davis's property,[1] Jeffrey Davis's brother, Richard Davis, drove onto the property through a locked gate

---

[1]To avoid confusion because the three appellants share the last name Davis, we generally refer to Jeffrey and Cynthia Davis by their respective full names. Any possessive use of "the Davis's" refers to Jeffrey and Cynthia Davis collectively. We refer to Richard Davis by his full name throughout.

and, when asked, told officers in a moment of omniscient honesty that he knew "everything" about the marijuana growing operation.

We hold that the observations, upon which law enforcement officers relied to obtain the warrant to search the Davis's property, were not made within the curtilage of the Davis's home. As a result, the warrant did not violate the Davis's Fourth Amendment rights. We must also determine whether the law enforcement officers violated Richard Davis's constitutional rights by questioning him, searching his person, searching his vehicle, and subsequently searching his property. With the exception of the search of a tin container found on Richard Davis's person, our answer is no. But because any error arising from its discovery was harmless, the motions to suppress all evidence seized were properly denied.

We have jurisdiction pursuant to 28 U.S.C. § 1291. We affirm.

## I.

## A.

In the fall of 2004, Pete Jenista, a narcotics detective in Josephine County, Oregon received a tip from a confidential informant about a marijuana growing operation at 2010 Stewart Road in Grants Pass, Oregon. Detective Jenista determined that the eighty-acre parcel of land at that address was owned by Jeffrey and Cynthia Davis and that they lived on the property with their daughter, Heather. The property is bordered by land owned by the Bureau of Land Management to the east and west. Cynthia Davis (herself) owned the property directly adjoining 2010 Stewart Road to the south. Richard Davis owned a forty-acre parcel of land approximately a half-mile away which was only accessible using the same road that accesses the 2010 Stewart Road property.

At the time Jeffrey and Cynthia Davis purchased the property at 2010 Stewart Road in the mid-1990s, it did not contain a homesite. The property is extremely rural, heavily wooded, and hilly. The closest home is almost a half-mile away. Jeffrey and Cynthia Davis developed the property, building a home and a large workshop. The workshop was set well apart from the house and partially surrounded by a chain-link fence. Inside the workshop, in addition to the marijuana growing operation, there was a freezer and refrigerator-freezer, a walk-in 700 bottle wine cellar, a shower, toilet, and a urinal. Jeffrey and Cynthia Davis stored Christmas materials and tools in the workshop and used a barbeque pit under the workshop's awning for barbeques.

At approximately 9:30 p.m. on October 12, 2004, Detective Jenista met two other detectives and drove to the area where Stewart Road turns from pavement to gravel. The detectives continued up the gravel road on foot approximately 300 feet, where they proceeded past an electric gate. The gate, which was donated by Jeffrey and Richard Davis, sits on property belonging to a nearby Girl Scouts camp. It is used to access the Davis's property, the Girl Scouts camp, and the BLM property. Multiple parties have access codes to the gate. When the detectives proceeded past the gate, they did not see two no trespassing signs, which were laying on the ground near the gate. Additionally, there was a posted sign near the gate which read:

> Winema Girl Scout Council
> This road is for access to private property and Camp
> Ruth Hyde only!
> No hunting or motorcycling!
> It is closed to all others!

The detectives also passed a similar Girl Scouts' sign posted a short distance beyond the gate.

When the detectives got within approximately 500 feet of the Davis's residence, numerous outdoor lights illuminated

the residence and the area in and around the large workshop. Detective Jenista heard the sound of a generator running from the direction of the large shop. He also smelled an odor, which he identified from experience as the odor of green-growing marijuana. Another detective also smelled the marijuana odor.

The detectives then left the road and walked through the woods along an old unused skid road toward the Davis's workshop. A dirt barrier had been erected to prevent vehicles from driving on the skid road. The detectives followed the skid road to the southernmost portion of a pond on the Davis's property near the workshop. To reach the workshop without being seen, the detectives circled the pond to the south and east, walking through a very heavily wooded gully. When they came out of the gully, the detectives were at the bottom of a short, steep embankment below the workshop. At that location, the detectives were able to observe the chain-link fence around the workshop. Both the workshop and the area around the workshop were extremely well-lit, and the detectives were able to observe commercial equipment inside the workshop. They did not observe anything to indicate domestic activity.

The detectives next walked up the embankment to the edge of the fence, where they observed steam coming off the top of the building and heard the sound of the generator more clearly. The detectives walked along the outside of the fence to the northeast. As they approached the area adjacent to the workshop itself, the brush and trees became extremely heavy, and the embankment became very steep. Just inside the heaviest brush, the detectives saw a light-colored pipe sticking out of the embankment, facing southeast, which was approximately a foot or more in diameter. The pipe protruded from the steeply angled embankment, approximately five to six feet outside of the chain-link fence. Detective Jenista placed his hand in front of the pipe and felt warm, humid air being pushed out. He also placed his head near the entrance of the

pipe, smelled the odor of green-growing marijuana, and heard an exhaust fan somewhere down the length of the pipe. The detectives then left the area near the workshop and returned to the gravel roadway, again smelling marijuana at the same location where it originally caught their attention.

On October 21, 2004, the detectives obtained a search warrant based on Detective Jenista's affidavit describing his observations on the Davis's property. On October 22, 2004, twelve to fifteen officers and agents from various law enforcement agencies executed the search warrant. The officers discovered approximately 3,200 green-growing marijuana plants, approximately 60 pounds of dry, processed marijuana which had been prepared for sale, approximately $50,000 in a safe, and over sixty firearms.

## B.

While officers were executing the search warrant, Richard Davis drove onto the property. Richard Davis exited his vehicle and asked two approaching deputies what was going on. The deputies informed him that they were executing a search warrant. Richard Davis asked more questions, but the deputies informed him that he needed to speak to one of the detectives, and that he needed to be read the search warrant. While Richard Davis waited to be read the search warrant, the deputies continued conversing with him. Reserve Deputy Andrew Aguinaga asked Richard Davis why he was there. He responded that he was on the property to see his brother. Deputy Aguinaga obtained Richard Davis's name, date of birth, and asked him "if he could grab his driver's license, and while he was near his vehicle if he could possibly move it out of the way so that [the officers'] vehicles could enter the driveway." At some point during the encounter, Richard Davis asked if he could leave. Deputy Aguinaga informed Richard Davis that he could not, presumably because he had not yet been read the warrant. After Richard Davis moved his vehicle and retrieved his identification, Deputy Aguinaga gave Richard

Davis's driver's license to Agent Ronald Wright of the Drug Enforcement Administration. Deputy Aguinaga's entire contact with Richard Davis lasted less than ten minutes.

Meanwhile, another deputy summoned Sheriff's Sergeant Ken Selig to speak with Richard Davis. When he arrived to the driveway area, Sergeant Selig, who supervised the Josephine County Sheriff's Office Interagency Narcotics unit, read the search warrant to Richard Davis. Sergeant Selig then observed while reserve deputies searched Richard Davis. The deputies found hashish oil in a tin on Richard Davis's person. Sergeant Selig then introduced Richard Davis to Agent Wright and departed. Sergeant Selig's entire contact with Richard Davis lasted approximately ten to fifteen minutes.

While Richard Davis was still standing in the driveway, Agent Wright asked him questions regarding his living situation. According to Richard Davis, the conversation was "casual" and "low-key." Richard Davis was not in handcuffs, and Agent Wright did not tell him he was under arrest. Agent Wright did not know whether Richard Davis had been searched or frisked prior to his contact with him. Agent Wright asked Richard Davis what he knew about "what was going on in the large shop . . . where the marijuana grow was located." Richard Davis responded "everything." Agent Wright then asked a follow-up question about Richard Davis's role in the operation to which Richard Davis responded that he "helped." Agent Wright inquired how long he had been involved, and Richard Davis then stated that he thought he ought to talk to an attorney. At that point, Agent Wright stopped the conversation. Either Sergeant Selig or one of Selig's deputies escorted Richard Davis to the main residence. At some point before he was escorted to the main residence, but after talking to Agent Wright, Richard Davis was handcuffed. Agent Wright's entire contact with Richard Davis lasted five to ten minutes.

After Richard Davis was escorted to the main residence, Agent Wright searched Richard Davis's vehicle. There,

Wright found handguns, thousands of dollars in cash, and a pair of scissors with a residue stain. Officers used the evidence found in Richard Davis's vehicle, along with his statements, to obtain a warrant to search his property on Lower River Road, approximately a half-mile away from the Davis's property at 2010 Stewart Road. Officers found another 150 marijuana plants growing at the Lower River Road property.

## C.

On March 7, 2005, a superseding indictment was filed charging Jeffrey Davis, Cynthia Davis, Richard Davis, and Kyle Blondin (Jeffrey Davis' daughter's boyfriend) with: 1) conspiracy to manufacture 1,000 or more marijuana plants in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(vii), and 21 U.S.C. § 846; and 2) manufacture of more than 1,000 marijuana plants in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A)(vii). The indictment further alleged that all defendants were involved in manufacturing 3,000 or more marijuana plants.

Jeffrey Davis was also charged with possession of an unregistered destructive device, a "Street Sweeper" revolving cylinder shotgun, in violation of 26 U.S.C. § 5861(d), and two counts of possession of an unregistered machine gun in violation of 26 U.S.C. § 5861(d). Richard Davis was also charged with one count of possession of an unregistered destructive device for possessing the "Street Sweeper."

On October 31, 2005, Jeffrey Davis filed a motion to suppress all of the evidence and statements obtained as a result of the search of the Davis property. Cynthia Davis and Richard Davis joined the motion. Jeffrey Davis argued that the government relied upon observations made within the curtilage of the Davis home in order to obtain a search warrant and that, without the challenged observations, probable cause for the search warrant was lacking.

On November 15, 2005, Richard Davis filed a separate motion to suppress, which Jeffrey Davis joined. Richard Davis argued that the warrant used to search the Davis residence was overly broad as it applied to him and his vehicle. Richard Davis also argued that, because law enforcement officers never read him the *Miranda* warnings, his statements and the fruit of those statements should be suppressed. *See Miranda v. Arizona*, 384 U.S. 436, 444-45 (1966).

On May 24, 2006, the district court denied Jeffrey Davis's motion to suppress. The district court concluded that: 1) in the course of gathering information for the search warrant, the detectives did not enter the curtilage of the Davis's home; and 2) as a result, the search did not violate the Fourth Amendment. The court noted that the government had argued that Richard Davis possessed no reasonable expectation of privacy in his brother's house or shop and therefore could not contest the validity of the search, but declined to reach the merits of that argument.

The district court also denied Richard Davis's motion to suppress. The court held that, because Richard Davis was not "in custody" at the time that he was questioned, he was not entitled to receive *Miranda* warnings. The district court also held: 1) that the search warrant authorizing the search of all vehicles visiting or frequenting the property was not facially overbroad; and 2) that Richard Davis's statements and the discovery of hashish oil on his person independently gave rise to probable cause to search his vehicle.

On October 11, 2006, both Jeffrey Davis and Richard Davis pled guilty to one count each of manufacture of marijuana, and one count each of possession of an unregistered destructive device. On the same day, Cythnia Davis pled guilty to conspiracy to manufacture marijuana. All three entered conditional pleas, preserving their right to appeal the denial of their motions to suppress. All three now separately

appeal the district court's denial of those motions. We consolidated their appeals.

## II.

We review de novo the denial of a motion to suppress, while the underlying factual findings are reviewed for clear error. *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc). In so reviewing, we also review de novo: 1) whether an area of land is protected under the Fourth Amendment as the curtilage of a dwelling house, *United States v. Barajas-Avalos*, 377 F.3d 1040, 1054 (9th Cir. 2004) (citing *United States v. Johnson*, 256 F.3d 895, 909 n.1 (9th Cir. 2001) (en banc)); 2) whether a suspect is "in custody" for purposes of *Miranda*, *United States v. Kim*, 292 F.3d 969, 973 (9th Cir. 2002); 3) the district court's reasonable suspicion determinations, *United States v. Arvizu*, 534 U.S. 266, 275 (2002); and 4) the district court's determination of probable cause, *United States v. Pinela-Hernandez*, 262 F.3d 974, 977 (9th Cir. 2001).

## III.

Jeffrey, Cynthia, and Richard Davis all argue that the detectives violated their Fourth Amendment rights by entering the clearing around the Davis's home, which contained the main house, workshop, and pond. Specifically, all three argue that this area constitutes the curtilage of the home and, because the detectives entered without a warrant, none of their observations can be considered in determining whether Detective Jenista's affidavit set forth sufficient facts to justify the issuance of a search warrant. Jeffrey, Cynthia, and Richard Davis further argue that Detective Jenista's affidavit does not set forth sufficient facts to establish probable cause to search the property at 2010 Stewart Road, if the observations of the detectives during their alleged trespass onto the property are excised from the affidavit.

**[1]** "For the purposes of the Fourth Amendment, curtilage . . . extends to a larger area the right to privacy a person enjoys inside the home . . . ." *United States v. Gorman*, 104 F.3d 272, 274 (9th Cir. 1996) (citing *Oliver v. United States*, 466 U.S. 170, 178 (1984)). In *United States v. Dunn*, 480 U.S. 294, 301 (1987), the Supreme Court held that "curtilage questions should be resolved with particular reference to four factors," including: (1) "the proximity of the area claimed to be curtilage to the home," (2) "whether the area is included within an enclosure surrounding the home," (3) "the nature of the uses to which the area is put," and (4) "the steps taken by the resident to protect the area from observation by people passing by." These factors "are useful analytical tools only to the degree that, in any given case, they bear upon the centrally relevant consideration — whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *Id*. We address each of the four *Dunn* factors in turn.

## A.

**[2]** There is not any "fixed distance at which curtilage ends." *United States v. Depew*, 8 F.3d 1424, 1427 (9th Cir. 1993), *overruled on other grounds by Johnson*, 256 F.3d at 911-14. In *Dunn*, the area near a barn from which officers made observations was approximately 60 yards from the house on the property. 480 U.S. at 302. The Court stated that 180 feet was a "substantial distance support[ing] no inference that the barn should be treated as an adjunct of the house." *Id*. Like the barn in *Dunn*, the area near the Davis's workshop was located approximately 180 feet from the house. Additionally, the exhaust pipe where Detective Jenista made the majority of his incriminating observations was more than 200 feet from the Davis's house. Thus, standing alone, the proximity factor weighs against finding that the area outside of the Davis's workshop lay within the curtilage. The fact that the Davis's property was rural does not change our analysis. In

*Dunn*, the defendant's property was equally rural and more than 100 acres larger than the Davis's property. *See id.* at 297.

## B.

" '[F]or most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage — as the area around the home to which the activity of home life extends — is a familiar one easily understood from our daily experience.' " *Id.* at 302 (quoting *Oliver*, 466 U.S. at 182 n.12). Although not conclusive, "[f]encing configurations are important factors in defining the curtilage." *Id.* at 301 n.4.

[3] Here, the Davis's workshop was not within any enclosure that also encompassed the house. In fact, the workshop was set apart from the house and other areas of the Davis's property by a separate chain-link fence. Even if we accepted that the workshop itself was part of the curtilage, all of Detective Jenista's observations were made from the area outside the fence. Further, the exhaust pipe, which offered the most incriminating evidence, protruded from a steep embankment outside the fence and was hidden in trees and heavy brush. Accordingly, the area around the workshop and the area where the exhaust pipe was located "stand[ ] out as a distinct portion of [the Davis's property], quite separate from the residence." *Id.* at 302.

## C.

In *Dunn*, the Court analyzed the use of the barn at issue in that case from the point of view of officers approaching the area, and in light of its actual use. *See id.* at 302-03; *see also Johnson*, 256 F.3d at 917 (Kozinski, J. concurring in part, dissenting in part) (noting that this Court has emphasized both actual use and "what an observer standing outside the structure could have known"). When analyzing the nature of the uses to which the area in question is put, the Supreme Court has found it "especially significant that the law enforcement

officials possessed objective data indicating that the [area] was not being used for intimate activities of the home." *Dunn*, 480 U.S. at 302.

Although there is some evidence that Jeffrey and Cynthia Davis used the workshop to store bulk food, wine, and Christmas decorations, the detectives smelled the marijuana while standing in an area outside the workshop. Thus, we need not decide whether the interior of the workshop fell within the curtilage. *See United States v. Van Damme*, 48 F.3d 461, 465 (9th Cir. 1995) (holding that where officers smelled marijuana from outside greenhouses, there was "[no] need to reach the question of whether the interior of the greenhouses constituted 'open fields' ").

**[4]** From an objective standpoint, the detectives had received a tip that there was a large marijuana growing operation on the property. From the area outside the workshop, the detectives observed no sign of domestic activity. Instead, they heard a generator running, observed extremely bright lights, and smelled the odor of marijuana. All of these observations were consistent with a marijuana growing operation, which is not an "intimate activity of the home." *See id.* at 464 ("The cultivation of crops, such as marijuana, is one of those activities that occur in 'open fields,' not an intimate activity of the home." (citing *Oliver*, 466 U.S. at 179)). Finally, the exhaust pipe protruding the embankment was hidden in a wooded area, with no signs of domestication. Thus, the use of the area in question also weighs against a finding that it was within the curtilage of the Davis's home.

## D.

The last *Dunn* factor requires us to consider the extent to which Jeffrey and Cynthia Davis attempted "to protect [the area alleged to be curtilage] from observation by those standing in the open fields." 480 U.S. at 303. Jeffrey, Cynthia, and Richard Davis all emphasize the fact that the property lay

behind an electric gate and several no trespassing signs. The remote location of the property, the electric gate, and the fact that the house, workshop and pond were surrounded by heavy woods all suggest that the Davis's chose this property because it was not easily viewed by passers-by. *See Depew*, 8 F.3d at 1428.

However, our inquiry focuses on the extent to which Jeffrey and Cynthia Davis attempted to protect the area around the workshop and exhaust pipe from view, not the entire property. *See*, *e.g.*, *United States v. Traynor*, 990 F.2d 1153, 1158-59 (9th Cir. 1993), *overruled on other grounds by Johnson*, 256 F.3d at 911-14. Near the workshop itself, there was a chain-link fence which, by its nature, is not designed to prevent observation. There was also a sign on the fence which read, "This dog can make it to the fence in three seconds can you?" However, "the presence of a 'No Trespassing' sign does not itself create a legitimate expectation of privacy." *Id.* at 1159 (citing *Oliver*, 466 U.S. at 182). Nothing, other than the property's remote location and trees, prevented the detectives from observing the area around the workshop or exhaust pipe. Thus, at best, this factor is neutral.

**[5]** Considered together, the *Dunn* factors weigh against a finding that the area outside the fence around the workshop, including the area where the exhaust pipe was located lay within the curtilage of the Davis's property. The detectives first smelled the marijuana well before they neared the workshop. The workshop itself was set nearly 200 feet from the house and set apart from the house by a fence. The detectives observed no domestic activity from the area outside the workshop and apart from the natural topography of the property, it was not shielded from view. Additionally, the exhaust pipe extended beyond the fence protecting the workshop in a wooded area where no domestic activity occurred.

**[6]** We hold that neither the area around the workshop nor the area where the exhaust pipe was located was an area "inti-

mately tied to the home itself." *See Dunn*, 480 U.S. at 301. Accordingly, the detectives did not violate the Fourth Amendment rights of Jeffrey, Cynthia, or Richard Davis and Detective Jenista's observations established probable cause for the search warrant of 2010 Stewart Road.[2] Thus, the district court correctly denied Jeffrey Davis's motion to suppress.

## IV.

We next turn to Richard Davis's claims that law enforcement officers violated his Fourth Amendment rights by: 1) detaining him; 2) questioning him; 3) frisking him; 4) searching his vehicle; and 5) searching his property at Lower River Road.

## A.

**[7]** Richard Davis first argues that the district court should have suppressed both his statements and the officers' subsequent searches of his vehicle and property because the deputies initial detention of him when he drove onto his brother's property violated his Fourth Amendment right to be secure against an unreasonable seizure of his person. The traditional rule is that "an official seizure of [a] person must be supported by probable cause, even if no formal arrest is made." *Michigan v. Summers*, 452 U.S. 692, 696 (1981) (citing *Dunaway v. New York*, 442 U.S. 200 (1979)). However, some seizures which would fall under this general rule "constitute such limited intrusions on the personal security of those detained and are justified by such substantial law enforcement interests that they may be made on less than probable cause, so long as police have an articulable basis for suspecting criminal activity." *Id.* at 699; *see, e.g., Terry v. Ohio*, 392 U.S. 1, 21-22 (1968). A seizure effected by law enforcement while executing a valid search warrant falls within this limited

---

[2]Like the district court, we need not reach the issue of whether Richard Davis had a reasonable expectation of privacy in the Davis's workshop.

exception. "[F]or Fourth Amendment purposes . . . a warrant to search for contraband founded on probable cause implicitly carries with it the limited authority to detain the occupants of the premises while a proper search is conducted." *Summers*, 452 U.S. at 705 (footnote omitted). "An officer's authority to detain incident to a search is categorical; it does not depend on the 'quantum of proof justifying detention or the extent of the intrusion to be imposed by the seizure.' " *Muehler v. Mena*, 544 U.S. 93, 98 (2005) (quoting *Summers*, 452 U.S. at 705 n.19).

**[8]** We have rejected attempts to distinguish *Summers* based on the facts that a detainee has no ownership interest in the property being searched or that the detainee was not at the premises when detained. *See United States v. Taylor*, 716 F.2d 701, 707 (9th Cir. 1983) ("The Court clearly framed *Summers* in terms of 'occupants,' not owners, and explicitly found no constitutional significance in the fact that some of the 'occupants' were seized on the sidewalk as they were leaving the house."). The Sixth Circuit has addressed a factual scenario like that presented here and reasoned that the detention of a non-resident was permissible based upon both officer safety and the legitimate interest in preventing flight in the event incriminating evidence was found. *See United States v. Bohannon*, 225 F.3d 615, 617 (6th Cir. 2000) (concluding that even though the person detained was not inside the residence, and had pulled up in a car as the officers were concluding their search, "[t]he policy justifications of *Summers* . . . especially to protect officers' safety, are applicable"). We agree.

**[9]** Although Richard Davis was not present at his brother's property when the officers began executing the constitutionally valid search warrant, he arrived in the midst of the search. At the time Richard Davis arrived at the property, the officers knew that: 1) the property contained a large marijuana growing operation; and 2) in order to reach the property during the search, Richard Davis had passed through an electric gate which was closed, and to which only a limited number of par-

ties had the code. Therefore, the police "could reasonably infer" that he was involved in criminal activity. *See Bohannon*, 225 F.3d at 617. Given the circumstances of his arrival at the scene of the execution of the search warrant, Richard Davis's detention was justified both by the need for both officers' safety and "the legitimate law enforcement interest in preventing flight in the event that incriminating evidence is found" and did not violate his Fourth Amendment rights. *See Summers*, 452 U.S. at 702. Thus, the district court did not err by concluding that the officers' actions were "reasonable and necessary procedures to secure the premises during the search."

## B.

Richard Davis also contends that: 1) he was in custody for *Miranda* purposes at the time Agent Wright questioned him; and 2) because he was not given *Miranda* warnings, the district court should have suppressed both his statements to Agent Wright and the subsequent fruit of those statements. "[W]hether an individual detained during the execution of a search warrant has been unreasonably seized for Fourth Amendment purposes and whether that individual is 'in custody' for *Miranda* purposes are two different issues." *United States v. Kim*, 292 F.3d at 976. Where an individual has been detained incident to a search warrant, and officers' questioning stays within the bounds of questioning permitted during a *Terry* stop, *Miranda* rights are not required. *See id*. (citing *Berkemer v. McCarthy*, 468 U.S. 420, 439-40 (1984)). If, however, the individual is asked questions going "beyond a brief *Terry*-type inquiry," the individual is entitled to *Miranda* warnings. *Id*.

Because we hold that Richard Davis was detained incident to the execution of a search warrant, we must determine whether the officers' questioning of him stayed within the bounds of those permitted during a *Terry* stop. During a *Terry* stop, officers "may ask the detainee a moderate number of

questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." *Berkemer*, 468 U.S. at 439.

During Richard Davis's initial encounter with the deputies, he was very briefly questioned about who he was and why he was on the property. Richard Davis was next questioned by Agent Wright. In his conversation with Agent Wright (which Richard Davis described as "casual" and "low-key"), Agent Wright asked Richard Davis about his living situation and what he knew about "what was going on in the large shop . . . where the marijuana grow was located." After Richard Davis responded, "everything," Agent Wright asked a follow-up question about Richard Davis's role in the operation. Agent Wright then asked another follow-up question about how long Richard Davis had been involved in the operation.

**[10]** None of these questions went beyond those that would normally be permissible during a *Terry* stop. The total number of questions asked of Richard Davis by law enforcement officers was minimal. The deputies' initial questions were directed at determining Richard Davis's identity and reason for being on the property. The four or so questions asked by Agent Wright were all aimed at obtaining information to confirm or dispel Agent Wright's suspicion that Richard Davis might be part of the marijuana growing operation given that he was related to the property owners and arrived at the property via a locked, electric gate. Accordingly, law enforcement officers were not required to advise Richard Davis of his *Miranda* rights. *See Kim*, 292 F.3d at 976.

## C.

Richard Davis next argues that the evidence found as a result of the search of his person must be suppressed because the frisk violated his Fourth Amendment rights. Generally, if an officer has a reasonable articulable suspicion that a person "pose[s] a threat to his safety or the safety of others, he [can]

detain him to conduct an investigatory, 'pat down' frisk, consistent with the Fourth Amendment's prohibition against 'unreasonable searches and seizures.' " *United States v. Terry-Crespo*, 356 F.3d 1170, 1173 (9th Cir. 2004) (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). "The 'narrow scope' of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place." *Ybarra v. Illinois*, 444 U.S. 85, 94 (1979).

Thus, the officers' frisk of Richard Davis violated the Fourth Amendment unless they had a reasonable belief or suspicion that he could be armed or posed a threat to their safety. There is no testimony in the record that the officers observed any suspicious bulges, that Richard Davis' demeanor aroused the officer's concern, or that he acted in a threatening manner. *See United States v. Flatter*, 456 F.3d 1154, 1157-58 (9th Cir. 2006) (noting factors supporting reasonable belief that an individual would be armed, and concluding that none of the factors was present). However, at the time they frisked Richard Davis, the officers knew that: 1) the property contained a large marijuana growing operation; 2) Richard Davis had passed through a locked electric gate to access the property; and 3) that Richard Davis was related to the owners of the property.

**[11]** Based on these facts, the officers reasonably suspected that Richard Davis was involved in the marijuana operation. Unlike the defendant in *Ybarra*, the frisk of Richard Davis did not occur in a public place to which he was not connected. "Common sense suggests that there is a much greater likelihood that a person found in a small private residence containing drugs will be involved in the drug activity occurring there than an individual who happens to be in a public tavern where the bartender is suspected of possessing drugs." *United States v. Reid*, 997 F.2d 1576, 1578-79 (D.C. Cir. 1993) (citing *Ybarra*, 444 U.S. at 91); *see also United States v. Ridge*, 329

F.3d 535, 541 (6th Cir. 2003) (reasoning that because officers were searching a suspected methamphetamine lab, they could reasonably infer that a customer or distributor would arrive on the premises (citing *Bohannon*, 225 F.3d at 617)). Because officers reasonably suspected that Richard Davis was involved in narcotics activity, it was also reasonable for them to suspect that he might be armed. *See United States v. $109,179 in United States Currency*, 228 F.3d 1080, 1086 (9th Cir. 2000) (concluding that "[b]ecause the police reasonably suspected [ the defendant] of dealing in narcotics, it was not unreasonable to believe that he might be armed"). Thus, the officers permissibly frisked him for weapons.

Although *Terry* does not allow "any search whatever for anything but weapons," *Ybarra*, 444 U.S. at 93-94, if, during the course of a lawful patdown, an officer feels an item he recognizes as contraband or evidence, the officer may seize the item. *See Minnesota v. Dickerson*, 508 U.S. 366, 375-76 (1993). However, the "incriminating character" of the item must be "immediately apparent." *Id.* In *Dickerson*, the Supreme Court held that the crack cocaine seized from a defendant's pocket was the product of an unlawful search because the officer had already determined that the defendant's pocket did not contain a weapon when he "squeez[ed], slid[ ] and otherwise manipulate[ed] the contents of the defendant's pocket" to determine the item's incriminating character. *Id.* at 378 (internal quotation marks omitted).

In a situation similar to the one presented here, we held that a small box containing ammunition should have been suppressed when it was discovered by a patdown which exceeded the "strictly circumscribed limits of *Terry*." *United States v. Miles*, 247 F.3d 1009, 1015 (9th Cir. 2001) (internal quotation marks omitted). In *Miles*, while performing a *Terry* patdown, an officer felt a small box about one-half the size of a package of cigarettes. *Id.* at 1014. The record did not indicate that the officer immediately recognized the box as contraband. *Id.* at 1014-15. Rather, the officer impermissibly continued to

squeeze and manipulate the box, at which point, he determined that it contained ammunition. *Id.* at 1015.

**[12]** Here, the record is not detailed as to the circumstances surrounding the frisk of Richard Davis. What is apparent from the record is that, during the frisk, officers discovered a tin containing hashish oil. As in *Miles*, nothing in the record indicates that officers immediately recognized the tin's incriminating character during the patdown. Thus, any further manipulation of the tin was impermissible. *See id.* at 1015. There is nothing inherently incriminating about a tin container and nothing in the record suggests that there was anything special about this particular tin. Thus, the scope of the frisk violated Richard Davis's Fourth Amendment rights and the district court erred by failing to suppress the hashish oil.[3] However, the error does not mandate reversal. As described below, the officers had other evidence, unrelated to the hashish oil, that was sufficient to establish probable cause to search Richard Davis's truck. Any error by the district court in failing to suppress the hashish oil was harmless.

---

[3]We reject the government's argument that it permissibly searched Richard Davis pursuant to the search warrant for 2010 Stewart Road, which provided for a search of "all other persons or occupants found to be keeping, visiting, or frequenting" the premises of the property. The warrant did not mention Richard Davis by name or contain any specific factual basis giving rise to a fair probability that contraband or evidence would be found on his person. *See Greenstreet v. County of San Bernardino*, 41 F.3d 1306, 1309 (9th Cir. 1994) ("A search warrant designating more than one person or place to be searched must contain sufficient probable cause to justify its issuance as to each person or place named therein.") (internal quotation marks omitted). The good faith exception of *United States v. Leon*, 468 U.S. 897 (1984), which allows officers, in some circumstances, to rely on the terms of the search warrant does not apply here. The affidavit supporting the warrant could not "create disagreement among thoughtful and competent judges as to the existence of probable cause" as to Richard Davis. *Id.* at 926.

## D.

Richard Davis also argues that the district court erred by failing to suppress evidence found after officers searched his vehicle. Although the Fourth Amendment generally forbids warrantless searches, the warrant requirement is subject to several well-established exceptions. One of these is the so-called "automobile exception." *See*, *e.g.*, *California v. Acevedo*, 500 U.S. 565, 569 (1991). The automobile exception permits police to search a vehicle as long as the vehicle is "readily mobile" and "probable cause exists to believe it contains contraband." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam). Therefore, we must determine whether officers had probable cause to believe that Richard Davis's truck contained contraband.

"Probable cause exists when, under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.' " *United States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Probable cause determinations may be based in part on reasonable inferences. *United States v. Gourde*, 440 F.3d 1065, 1071 (9th Cir. 2006) (en banc).

Because we hold that the hashish oil discovered on Richard Davis's person should have been suppressed, we must exclude it from our probable cause analysis. Apart from the hashish oil, the officers knew that: 1) Richard Davis accessed an electronic gate and drove his pick-up truck onto the property at 2010 Stewart Road; 2) the property at 2010 Stewart Road was home to a large marijuana growing operation, contained bulk quantities of processed marijuana, and numerous firearms; 3) Richard Davis readily admitted to knowing "everything" about the marijuana operation; and 4) Richard Davis also admitted that he "helped" with the marijuana operation.

**[13]** Based on this information, officers could have reasonably inferred that there was a "fair probability" that Richard Davis's vehicle contained contraband. Richard Davis not only knew about the marijuana growing operation, but participated in it. Given that the marijuana growing operation involved a large number of firearms, as well as large quantities of drugs and cash, it was not at all unreasonable for officers to infer that there was a "fair probability" that some or all of those items were in Richard Davis's vehicle during his visit to the drug operation. Accordingly, the officers' search of Richard Davis's vehicle was authorized by the "automobile exception" to the Fourth Amendment's warrant requirement. The district court thus did not err by refusing to suppress the evidence found as a result of the search of Richard Davis's vehicle.

### E.

**[14]** Finally, Richard Davis argues that the district court should have suppressed the evidence found as a result of the search of his property located on Lower River Road. Officers used the evidence found in Richard Davis's vehicle, along with his statements to Agent Wright, to obtain a warrant to search the Lower River Road property. Richard Davis challenges the search of the property only on the basis that the warrant was tainted because both the search of his vehicle and his statements to Agent Wright should have been suppressed. However, this argument is foreclosed in light of our holding that neither the evidence found in Richard Davis's vehicle nor his statements to law enforcement officers should have been suppressed. Accordingly, the evidence obtained under the search warrant for the property on Lower River Road is not "fruit of the poisonous tree." *See Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963).

### V.

In conclusion, the district court's denial of Jeffrey Davis's motion to suppress is affirmed. The observations law enforce-

ment officers relied upon to obtain the search warrant for 2010 Stewart Road were made outside the curtilage of the Davis's home.

The district court's denial of Richard Davis's motion to suppress is affirmed. Even without the tin of hashish oil, there was ample probable cause to justify the search of both Richard Davis's truck and his home. Because any error was harmless, the district court properly denied Richard Davis's motion.

**AFFIRMED.**