**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
            *Plaintiff-Appellee,*

            v.

DAVID T. BROWN,
            *Defendant-Appellant.*

No. 08-30040

D.C. No.
CR-07-00068-JLQ

OPINION

Appeal from the United States District Court
for the Eastern District of Washington
Justin L. Quackenbush, Senior District Judge, Presiding

Submitted March 13, 2009*
Seattle, Washington

Filed April 17, 2009

Before: William A. Fletcher, Ronald M. Gould and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman

*The panel unanimously finds this case suitable for decision without oral argument. *See* Fed. R. App. P. 34(a)(2).

---

**COUNSEL**

Kimberly A. Deater, Spokane, Washington, for the defendant-appellant.

Aine Ahmed, Assistant United States Attorney, Spokane, Washington, for the plaintiff-appellee.

---

**OPINION**

TALLMAN, Circuit Judge:

David Brown pleaded guilty to being a felon in possession of firearms and ammunition. On appeal, Brown contests the denial of his pretrial motion to suppress the firearms and ammunition seized during a search of the home in which he had been staying for several nights. A co-occupant of the home consented to the search. Brown had been arrested while walking down the street, not far from the home, with the female co-occupant, and was sitting in a police car in custody when her consent was obtained. Brown contends that her

consent was not voluntary, and furthermore that her consent was ineffective as to him because officers should have sought his permission pursuant to *Georgia v. Randolph*, 547 U.S. 103 (2006). We have jurisdiction under 28 U.S.C. § 1291, reject his arguments, and affirm.

# I

On April 3, 2007, Special Agent Dale Watson of the Bureau of Alcohol, Tobacco, Firearms and Explosives received information from a confidential informant that Brown, wanted on an outstanding warrant for the felony offense of second degree assault, was staying at 807 East Augusta Avenue (the "East Augusta Residence") in Spokane, Washington, and was in possession of two firearms. Agent Watson and several members of the Spokane Gang Enforcement Team set up surveillance in the neighborhood and soon spotted Brown walking with Lacie Rishel. The officers approached with guns drawn. Both Brown and Rishel were ordered to the ground, handcuffed, and patted down for weapons. No firearm was found on Brown's person. The officers arrested Brown on the outstanding warrant, placed him in a squad car, and eventually transported him to the Spokane County Jail. At no time did Agent Watson ask Brown for permission to search the East Augusta Residence.

Agent Watson initiated a discussion with Rishel while she was in handcuffs. The parties dispute how long Rishel was in handcuffs and when during her exchange with Agent Watson they were removed. Because the district court denied Brown's suppression motion, we interpret the evidence from the suppression hearing in the light most favorable to the government absent a contrary factual finding by the court. *See United States v. Patayan Soriano*, 361 F.3d 494, 501 (9th Cir. 2004). Rishel informed Agent Watson that she lived at the East Augusta Residence with her boyfriend, Devion Tensley, and that Brown had been sleeping on their couch for the past few nights as their guest. At the suppression hearing, Agent Wat-

son and Rishel offered conflicting testimony on how the discussion progressed thereafter.

Agent Watson testified that after informing Rishel that Brown was likely in possession of two firearms and that these were probably located at the East Augusta Residence, Rishel "adamantly denied" this and stated, "Well, you know what, you can come down and look if you want." On cross-examination, Agent Watson repeatedly denied that he or any other officer told Rishel either that they had enough evidence to get a search warrant or that they would "mess [the] house up" and "slice [the] couches" if forced to obtain one.

During direct and redirect examination, Rishel denied inviting Agent Watson to search the East Augusta Residence. To the contrary, Rishel claimed that the officers threatened not only to lock her out until they obtained a search warrant, but also to "tear [the] place apart" if forced to take that route. She stated that she only agreed to the search because of these threats. Upon cross-examination, however, Rishel also admitted to Agent Watson's version of the events:

> Q.  [D]o you recall telling agent Watson . . . that you didn't believe that there were any firearms in your apartment and if he wanted to, he could search it, do you recall saying that to him?
>
> A.  Right, yes.
>
> Q.  *Before* he ever asked you anything about searching that apartment, any consent or whatever, you offered him the opportunity to search your apartment, did you not?
>
> A.  Right.

(Emphasis added.) The district court found that Rishel spontaneously volunteered consent without any prompting by Agent Watson.

The parties agree that after her exchange with Agent Watson, Rishel walked back to the East Augusta Residence alone. Agent Watson testified that because Rishel expressed concern that her landlord would be upset by law enforcement activity, the officers removed some police insignia before meeting Rishel at home. Rishel denied making such a request, and further claimed that the officers were already waiting for her outside the East Augusta Residence when she arrived.

Agent Watson's and Rishel's accounts of the search itself are mostly in accord. After entering the apartment, Agent Watson asked if he could search the area where Brown had slept, and Rishel consented. Agent Watson found a semiautomatic pistol under a couch cushion. Upon probing by the agents, Rishel revealed that the revolver was likely in the bedroom she shared with Tensley. After Agent Watson asked Rishel if he could search the bedroom and she consented, he found a .357 caliber revolver in a chest of drawers.

Tensley, Rishel's boyfriend, arrived at the East Augusta Residence after the officers had finished their search. Agent Watson explained that Brown had been arrested on an outstanding warrant, that Rishel had consented to a search of the East Augusta Residence, and that two firearms had been found. Because Rishel expressed fear of Tensley's reaction should he learn of her cooperation, Agent Watson also asked Tensley not to be upset with Rishel for consenting to the search—adding that he believed he had probable cause for a search warrant and likely would have applied for one had he needed to do so.

Brown was charged by indictment with being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. §§ 922(g)(1) and 924. After hearing testimony, the district court denied Brown's motion to suppress the two firearms and ammunition. The court found that Rishel gave knowing and voluntary consent to search the apartment. The court also concluded that the officers did not violate the man-

date of *Georgia v. Randolph*, 547 U.S. 103 (2006), because Brown was placed in the police car pursuant to his arrest and prior to any discussion between Agent Watson and Rishel. Brown pleaded guilty but reserved the right to appeal the district court's ruling.

## II

We review *de novo* the denial of a motion to suppress evidence. *United States v. Davis*, 530 F.3d 1069, 1077 (9th Cir. 2008). We review the underlying factual findings for clear error. *Id.*

## A

We first address Brown's contention that the district court erred in finding that Rishel validly consented to search of the East Augusta Residence. "We review for clear error a district court's determination of the voluntariness of a defendant's consent to a search." *United States v. Todhunter*, 297 F.3d 886, 891 (9th Cir. 2002). "Review under the clearly erroneous standard is significantly deferential, 'requiring for reversal a definite and firm conviction that a mistake has been committed.' " *United States v. Elliott*, 322 F.3d 710, 714 (9th Cir. 2003) (quoting *United States v. Maldonado*, 215 F.3d 1046, 1050 (9th Cir. 2000)). Moreover, "evidence regarding the question of consent must be viewed in the light most favorable to the fact-finder's decision." *Patayan Soriano*, 361 F.3d at 501 (quoting *United States v. Kaplan*, 895 F.2d 618, 622 (9th Cir. 1990)). Thus, "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 503 (quoting *United States v. Garcia*, 135 F.3d 667, 671 (9th Cir. 1998)).

[1] A warrantless search is unconstitutional unless the government demonstrates that it "fall[s] within certain established and well-defined exceptions to the warrant clause." *United States v. Murphy*, 516 F.3d 1117, 1120 (9th Cir. 2008) (quot-

ing *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1298 (9th Cir. 1988)). Consent constitutes one such exception: "[A warrantless] search conducted pursuant to a valid consent is constitutionally permissible." *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). The government bears the burden of proving that consent was voluntary. *Patayan Soriano*, 361 F.3d at 501. Whether consent to search was voluntarily given is "to be determined from the totality of all the circumstances." *Schneckloth*, 412 U.S. at 227. We consider five factors in determining voluntariness:

> (1)   whether the [consenting individual] was in custody; (2) whether the arresting officers had their guns drawn; (3) whether Miranda warnings were given; (4) whether the [consenting individual] was notified that she had a right not to consent; and (5) whether the [consenting individual] had been told a search warrant could be obtained. *United States v. Jones*, 286 F.3d 1146, 1152 (9th Cir. 2002) (citing *United States v. Castillo*, 866 F.2d 1071, 1082 (9th Cir. 1989)). These factors serve merely as guideposts, "not [as] a mechanized formula to resolve the voluntariness inquiry." *Patayan Soriano*, 361 F.3d at 502. Moreover, no one factor is determinative. *Id.*

**[2]** With respect to the first factor, a seizure occurs "when, 'taking into account all of the circumstances surrounding the encounter, the police conduct would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.' " *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)) (internal quotation marks omitted). The Ninth Circuit has identified five factors that aid in determining whether a person's liberty has been so restrained:

> (1)   the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred

in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of his right to terminate the encounter.

*Id.* (citing *Orhorhaghe v. INS*, 38 F.3d 488, 494-96 (9th Cir. 1994)).

[3] Taking into account all of the circumstances surrounding her encounter with Agent Watson, we conclude that Rishel was not in custody. Although Brown and Rishel were admittedly approached by five or six officers with guns drawn —and were both ordered to the ground, handcuffed, and patted down for weapons—all these events occurred in a public setting and there is no evidence that police continued to display their weapons after Brown and Rishel were safely secured. Moreover, subsequent events would have communicated to a reasonable person that she was free to terminate the encounter. Paramount among these is that the officers treated Brown and Rishel very differently. Brown was arrested, placed in a squad car, and driven to the Spokane County Jail. By contrast, before Rishel consented to search of the East Augusta Residence, Agent Watson had released her from handcuffs and informed her that she was not under arrest.[1] He retrieved the key to the East Augusta Residence from Brown's front pocket and gave it to Rishel, who returned to

---

[1]The district court found that Rishel was released from handcuffs and informed that she was not under arrest *before* Agent Watson informed her that Brown was in possession of firearms. Rishel admitted on cross-examination that upon removing the handcuffs, Agent Watson informed her that she "was free to go." Moreover, she also admitted on cross that *after* telling her she was free to leave, Agent Watson then "proceeded to tell [her] . . . that Mr. Brown . . . had a couple of firearms." Because Agent Watson shared his information on Brown *before* Rishel consented to the search, the district court did not clearly err in finding that Rishel was not handcuffed and had been informed that she was not under arrest when she gave consent.

the apartment alone. According to Agent Watson, at Rishel's request, police removed their insignia before joining her at the apartment to conduct the search. Once inside the East Augusta Residence, Agent Watson specifically sought Rishel's consent to search the room where Brown had slept as well as the bedroom occupied by Rishel and Tensley. This police conduct would not have communicated to a reasonable person that she was not at liberty to ignore the police presence and go about her business.

[4] The remaining voluntariness factors do not tip the scales in Brown's favor. While officers first approached both Brown and Rishel with guns drawn, Brown does not contend that those weapons were still displayed after he and Rishel had been handcuffed. Rishel was not in custody, so "*Miranda* warnings were inapposite." *Patayan Soriano*, 361 F.3d at 504. Although Agent Watson admittedly did not notify Rishel that she had a right not to consent to search, this factor is not an absolute requirement for a finding of voluntariness, *Schneckloth*, 412 U.S. at 248-49, and also seems inapposite given that Rishel volunteered consent without any prompting whatsoever.[2] Finally, although the district court made no express finding with respect to whether either Agent Watson or another officer informed Rishel that they could obtain a warrant, the evidence does not support this contention. During cross-examination, Agent Watson denied that any officer threatened to obtain a warrant. He also admitted telling Tensley *after* the search that he had probable cause to obtain a warrant, but implied that he did so because Rishel feared her boyfriend's reaction should he discover that she voluntarily consented to the search. Rishel's testimony expressly supports this motivation.

[5] Given these circumstances, the district court did not

---

[2]As Rishel specifically admitted during cross- examination that she spontaneously invited Agent Watson to search the East Augusta Residence, the district court did not clearly err in so finding.

clearly err in finding that Rishel voluntarily consented to search of the East Augusta Residence.

## B

**[6]** In *Georgia v. Randolph*, the Supreme Court held that an occupant's consent to the warrantless search of a residence is not valid as to a physically present co-occupant who expressly refuses consent. 547 U.S. 103, 120 (2006). In so holding, the Supreme Court distinguished and expressly preserved its prior holdings in *United States v. Matlock*, 415 U.S. 164 (1974), and *Illinois v. Rodriguez*, 497 U.S. 177 (1990).

> The second loose end is the significance of *Matlock* and *Rodriguez* after today's decision. Although the *Matlock* defendant was not present with the opportunity to object, he was in a squad car not far away; the *Rodriguez* defendant was actually asleep in the apartment, and the police might have roused him with a knock on the door before they entered with only the consent of an apparent co-tenant. If those cases are not to be undercut by today's holding, we have to admit that we are drawing a fine line; if a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out.

> This is the line we draw, and we think the formalism is justified. *So long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection*, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive

weight to the fellow occupant's contrary indication when he expresses it.

*Randolph*, 547 U.S. at 121-22 (emphasis added). Seizing on the emphasized language, Brown argues that officers placed him in the squad car in order to avoid his possible objection to a search of the East Augusta Residence.

**[7]** The record does not support Brown's claim. While Agent Watson admitted focusing on Rishel rather than Brown in his effort to access the East Augusta Residence and secure the firearms in Brown's possession, Brown's claim that he was intentionally removed to avoid his objection during the consent colloquy with Rishel is mere speculation. *See United States v. McKerrell*, 491 F.3d 1221, 1228 (10th Cir. 2007) (upholding validity of co-tenant's consent to search where "McKerrell has not directed our attention to anything suspicious about the procedures that the police employed" and "[i]nstead . . . essentially urges us to accept his unjustified speculations and circumvent *Randolph*'s evidentiary requirement"), *cert. denied*, 128 S. Ct. 553 (2007). Officers placed Brown in the squad car pursuant to his lawful arrest on the assault charge and to transport him to the Spokane County Jail. *See United States v. Wilburn*, 473 F.3d 742, 745 (7th Cir. 2007) ("Wilburn was validly arrested . . . and he was lawfully kept in a place—the back seat of a squad car—where people under arrest are usually held. Given these facts, the police were not obligated to bring Wilburn to [his co-tenant] so he could be a party to the discussion regarding consent."), *cert. denied*, 127 S. Ct. 2958 (2007). Brown points to no evidence to the contrary.

Brown nonetheless relies on *United States v. Murphy*, in which we held that "*[i]f the police cannot prevent a co-tenant from objecting to a search through arrest*, surely they cannot arrest a co-tenant and then seek to ignore an objection he has already made." 516 F.3d at 1124-25 (emphasis added). But we said this in the context of the same *Randolph* passage

quoted above, and were thus referring to a pretextual arrest made for the specific purpose of preventing the arrestee's subsequent objection to the search. Again, there is no evidence that Brown's arrest was motivated by any purpose other than removing from the streets of Spokane a felon wanted on an outstanding warrant for second degree assault and reportedly in possession of firearms. Moreover, the emphasized language is dictum as the arrestee in *Murphy* had in fact refused consent to search; the search conducted was predicated on consent obtained two hours later from a co-tenant. *Id.* at 1124.

**[8]** That Agent Watson retrieved from Brown's pocket the key to the East Augusta residence after obtaining Rishel's consent,[3] and thus had an additional opportunity to obtain Brown's consent, does not alter the fact that Brown was justifiably absent from the search colloquy. Moreover, in light of the policy justifications provided in *Randolph* for the "fine line" drawn therein, Agent Watson's decision not to seek consent from Brown does not invalidate the consent spontaneously volunteered by Rishel. *Cf. United States v. Lopez*, 547 F.3d 397, 400 (2d Cir. 2008) ("[W]e hold that the marshals had no duty to ask Lopez whether he consented to the search, no matter how easy or convenient it might have been to do so."), *cert. denied*, __ S. Ct. __, 2009 WL 357581 (Mar. 23, 2009); *United States v. Ayoub*, 498 F.3d 532, 540 (6th Cir. 2007) (upholding validity of co-occupant's consent even though the court "f[ou]nd it curious that the officers never asked Ayoub for consent to search, though they had every opportunity—especially when they pulled him over as he left the house"), *cert. denied*, 129 S. Ct. 37 (2008).

**[9]** Seeking Brown's consent would have "needlessly

---

[3]The district court found that Agent Watson took the key from Brown's pocket *after* Rishel consented to a search of the East Augusta Residence. It did not clearly err in reaching this conclusion because the testimony established two equally plausible versions of the events. *See Patayan Soriano*, 361 F.3d at 503.

limit[ed] the capacity of the police to respond to ostensibly legitimate opportunities in the field." *Randolph*, 547 U.S. at 122. Agent Watson encountered two such opportunities on the day he arrested Brown—he encountered Brown in the company of a co-occupant, and that co-occupant later spontaneously volunteered consent to a search of the shared residence. These two legitimate opportunities allowed Agent Watson to remove from a felon's possession both a semiautomatic pistol and a revolver. Moreover, a contrary finding would open the door to turning every such case "into a test about the adequacy of the police's efforts to consult with a potential objector." *Id.*

Finally, the Supreme Court noted in *Randolph* that

> [t]he pragmatic decision to accept the simplicity of this line is . . . supported by the substantial number of instances in which suspects who are asked for permission to search actually consent, albeit imprudently, a fact that undercuts any argument that the police should try to locate a suspected inhabitant because his denial of consent would be a foregone conclusion.

*Id.* Even if, upon retrieving the key, Agent Watson had asked Brown for permission to search the East Augusta Residence, it is possible that Brown would have granted his consent, his current claims to the contrary notwithstanding.

**[10]** We thus agree with the district court that Agent Watson did not violate the Supreme Court's mandate in *Randolph*.

**AFFIRMED.**