UNITED STATES of America,
Plaintiff–Appellee,

v.

Mark Anthony MILES, Defendant–
Appellant.

No. 00–30035.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 10, 2001

Filed April 26, 2001

Nancy Bergeson, Assistant Federal Public Defender, Portland, Oregon, for the defendant-appellant.

Michael J. Brown, Assistant United States Attorney, Portland, Oregon, for the plaintiff-appellee.

Before: McKEOWN, W. FLETCHER and RAWLINSON, Circuit Judges.

McKEOWN, Circuit Judge:

In this case, we address whether a police officer, when conducting a patdown search for weapons during an investigatory stop, may lawfully go beyond a patdown and move or shake a small box in a suspect's clothes to determine its contents. Defendant Mark Miles appeals the district court's denial of his motion to suppress evidence, including a gun, bullets, and his statements, arguing that the police officers' intrusive detention of him amounted to an arrest without probable cause and that they subjected him to an unlawful search. Following denial of that motion, Miles entered a conditional guilty plea, under Federal Rule of Criminal Procedure 11(a)(2), to being a felon in possession of ammunition in violation of 18 U.S.C. § 922(g)(1). We reverse the district court's denial of Miles's motion to suppress and remand for further proceedings.

## BACKGROUND

At approximately 1:40 a.m. on Sunday, December 14, 1997, while on routine patrol, Portland police officers John Birkinbine and Tim Bacon learned by radio that a citizen had reported that a black male wearing an "oversized jacket" and riding a ten-speed-type bicycle eastbound on Northeast Portland Boulevard had fired a

gun at a residence on that street. According to Officer Birkinbine, the Portland Boulevard residence was "a house known to sell drugs and have a lot of activity all hours of the day and night."

Upon receiving the call, the officers drove to the vicinity of the Portland Boulevard residence to look for evidence. They "started working the blocks looking for someone matching th[e] description." Within twelve minutes of the emergency call, the officers observed Miles in the yard or on the sidewalk in front of a residence on Northeast Eighth Street, approximately six blocks from the Portland Boulevard residence. Miles was the first (and only) person the officers came across during their search who fit the description of the suspected shooter. Officer Birkinbine testified that it would be rare to see anyone on the street at that time of night in mid-December. Miles, a black male, was wearing an oversized jacket, and was standing in the immediate vicinity of a ten-speed-type bicycle that was lying in the yard of the Eighth Street residence. Officer Birkinbine also saw two other individuals; one was on the sidewalk or near the porch of the residence, and the other individual was near the porch.

In this neighborhood, the majority of the residents are African–American, it was relatively common for young males to ride bikes, and many of them wore big, bulky jackets. Nonetheless, Officer Birkinbine stopped Miles because he concluded that there was a reasonable possibility that he was the suspected shooter. Officer Birkinbine testified that, in doing so, he needed to exercise caution:

> I needed to exercise a tremendous amount of officer safety. I was concerned because there had been a gun in the call. Not just was there a gun that was seen, shots were actually fired. And not just in the air but actually into

a house. So I was definitely concerned for my safety and my partner's safety and also the other people there.

The officers therefore approached Miles with their guns drawn.

By that time, Miles had walked to the porch of the residence, close to the area where the other two individuals were located. The officers directed Miles to come down from the porch and kneel in the yard with his hands raised. Miles did so, and the officers handcuffed him behind his back. According to Officer Birkinbine's testimony, he stated in his police report that he "took [Miles] into custody to investigate the crime" and, after handcuffing Miles, "began to search his person for evidence." Officer Birkinbine also testified that he wanted to make sure that Miles did not "have any weapons or anything that was going to hurt me or anyone else or provide him with a means of escape," because he "knew that [Miles] was going to go into a police car."

Officer Birkinbine "did a check of [Miles's] outer garments" by "push[ing] in" to "check for weapons, sharp things, needles, knives, anything that ... might hurt [the officer] or facilitate escape." In doing so, Officer Birkinbine came across what felt like a box in Miles's pocket:

> I came across something hard in his outer pocket. And when I tried to wrap my hands around it from outside the pocket, I could tell that it was a box. And when I ... moved it up and down a little bit or back and forth, it sounded to me like bullets, loose bullets, in some sort of a container.

The box measured approximately 2–1/2 × 1–1/2 × 1. Officer Birkinbine "wrapped [his] hand around the box and sh[ook] it or move[d] it around." After "hear[ing] the bullets clanking together" and concluding that the box contained bullets and that Miles was the shooter, Officer Birkinbine

retrieved a cardboard box containing .22 caliber shells from Miles's pocket. Officer Birkinbine then advised Miles of his *Miranda* rights and arrested him. Later, a loaded gun was found in the yard of the Eighth Street residence, approximately six feet from where Officer Birkinbine first saw Miles. Subsequently, it was determined that the ammunition in the gun matched the ammunition in the box found in Miles's pocket.

The government filed a two-count indictment against Miles, charging him with being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1). Miles pled not guilty and filed a motion to suppress, arguing that he was arrested without probable cause when he was held at gunpoint and handcuffed before being questioned and that the officers exceeded the scope of an investigatory stop. Following a hearing, the district court denied the motion, finding that the officers' conduct constituted a proper investigatory stop under *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and that probable cause existed even if Miles's detention were construed as an arrest. The district court further concluded that Officer Birkinbine's discovery of the bullets arose from a proper *Terry* patdown.

Miles thereafter entered a Rule 11(a)(2) conditional guilty plea to being a felon in possession of ammunition, reserving his right to seek judicial review of the denial of his motion to suppress. The district court imposed a thirty-month sentence, and Miles filed this appeal.

### ANALYSIS

■ "Motions to suppress are generally reviewed de novo." *See United States v. Wright,* 215 F.3d 1020, 1025 (9th Cir.), *cert. denied,* — U.S. ——, 121 S.Ct. 406, 148 L.Ed.2d 313 (2000). "The determina-

tion of whether a seizure exceeds the bounds of a *Terry* stop and becomes a *de facto* arrest is reviewed *de novo.*" *United States v. Torres–Sanchez,* 83 F.3d 1123, 1127 (9th Cir.1996).

### I. THE STOP DID NOT AMOUNT TO AN ARREST

Miles does not dispute that there was a sufficient basis for an investigatory stop under *Terry.* Rather, he argues that the officers' intrusive detention-i.e., ordering him to his knees at gunpoint and handcuffing him behind his back-amounted to an arrest. Under the circumstances here, however, we cannot conclude that the officers' conduct was tantamount to an arrest.

■ It is well-settled that "[t]he purpose of a *Terry* stop is 'to allow the officer to pursue his investigation without fear of violence.'" *United States v. Taylor,* 716 F.2d 701, 708 (9th Cir.1983) (quoting *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972)). Generally, "[a] *Terry* stop involves no more than a brief stop, interrogation and, under proper circumstances, a brief check for weapons." *United States v. Robertson,* 833 F.2d 777, 780 (9th Cir.1987). If the stop proceeds beyond these limitations, an arrest occurs, which requires probable cause. *Id.* "There has been an arrest if, under the circumstances, a reasonable person would conclude that he was not free to leave after brief questioning." *United States v. Del Vizo,* 918 F.2d 821, 824 (9th Cir.1990).

■ Under ordinary circumstances, drawing weapons and using handcuffs are not part of a *Terry* stop. *Washington v. Lambert,* 98 F.3d 1181, 1187 (9th Cir.1996). Nevertheless, "we allow intrusive and aggressive police conduct without deeming it an arrest ... when it is a reasonable response to legitimate safety concerns on the part of the investigating officers." *Id.* at

1186; *accord Alexander v. County of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir.1995) ("It is well settled that when an officer reasonably believes force is necessary to protect his own safety or the safety of the public, measures used to restrain individuals, such as stopping them at gunpoint and handcuffing them, are reasonable."). In determining whether a stop amounts to an arrest, we also consider "the specificity of the information that leads the officers to suspect that the individuals they intend to question are the actual suspects being sought" and "the number of police officers present." *Lambert*, 98 F.3d at 1189–90.

■ We have permitted the use of intrusive means to effect a stop where the police have information that the suspect is currently armed or the stop closely follows a violent crime. *See Lambert*, 98 F.3d at 1189. Under such circumstances, holding a suspect at gunpoint, requiring him to go to his knees or lie down on the ground, and/or handcuffing him will not amount to an arrest. *See, e.g., Alexander*, 64 F.3d at 1320 (concluding that officers who had reasonable suspicion to stop defendants acted reasonably where they "had information that the robbery suspects had fired on a witness and thus had reason to believe the suspects were armed and dangerous," ordered defendants from car at gunpoint, and handcuffed them).

We conclude that the initial stop here did not amount to an arrest. Just minutes before spotting Miles, the officers had received a report of shots fired at a residence. Miles was the first and only person the officers came across who fit the description; he fit the description in all respects, and he was found within blocks of the reported crime. Moreover, Miles's relatively close proximity to two other individuals raised concerns for their safety as well as that of the officers, who were outnumbered. Approaching Miles with guns drawn, ordering him to his knees, and handcuffing him was, without doubt, "intrusive and aggressive police conduct." *Lambert*, 98 F.3d at 1186. But we reject Miles's contention that the officers could not detain him in that manner absent evidence that Miles was armed. The officers had a report of gunfire and had legitimate safety concerns. They made an on-the-spot assessment of the restraint necessary to control the situation. Like the district court, we conclude that their actions were reasonable.

## II. THE OFFICERS EXCEEDED THE SCOPE OF A *TERRY* PATDOWN

■ Miles also argues that the officers violated the strict limits of a *Terry* patdown by moving or shaking the box in his pocket. On this point we agree. During the course of a lawful patdown, if an officer feels an item that he recognizes as contraband or evidence, that "touch" may provide probable cause for the arrest of the person and seizure of the evidence. *See Minnesota v. Dickerson*, 508 U.S. 366, 375–76, 113 S.Ct. 2130; 124 L.Ed.2d 334 (1993). But, as the Supreme Court has told us, the range of the "touch" is not without limits. In order to be lawfully seized, the identity of the item must be "immediately apparent" to the officer while conducting a lawful search:

> If a police officer lawfully pats down a suspect's outer clothing and feels an object whose contour or mass makes its identity immediately apparent, there has been no invasion of the suspect's privacy beyond that already authorized by the officer's search for weapons; if the object is contraband, its warrantless seizure would be justified by the same practical considerations that inhere in the plain-view context.

*Id.* at 375–76, 113 S.Ct. 2130.

In *Dickerson*, the crack cocaine that the officer seized from the defendant's pocket

was the product of an unlawful search because the officer had already determined that the defendant's pocket did not contain a weapon when he "squeez[ed], slid[ ] and otherwise manipulat[ed] the contents of the defendant's pocket." *Id.* at 378, 113 S.Ct. 2130 (internal quotation marks omitted). The Supreme Court concluded that, under those circumstances, "it is clear that the police officer ... overstepped the bounds of the 'strictly circumscribed' search for weapons allowed under *Terry* " when he "continued [to] explor[e] ... respondent's pocket after having concluded that it contained no weapon." *Id.* (citation omitted). The incriminating character of the object was not immediately apparent to the officer; indeed, he determined that it was contraband "only *after* conducting a further search, one not authorized by *Terry.*" *Id.* at 379, 113 S.Ct. 2130 (emphasis added). It is significant that the Court relied on "the analogy to the plain-view doctrine" and emphasized that "[a]lthough the officer was lawfully in a position to feel the lump in [defendant's] pocket," the further search was "constitutionally invalid" because "the incriminating character of the object was not immediately apparent." *Id.* at 378–79, 113 S.Ct. 2130.

We recently applied the *Dickerson* rule in *United States v. Mattarolo,* 209 F.3d 1153 (9th Cir.), *cert. denied,* —— U.S. ——, 121 S.Ct. 208, 148 L.Ed.2d 146 (2000). There, the officer, while conducting a patdown, felt an object in the defendant's pocket that was

a couple of inches long and about an inch in circumference. To determine if it

might be a small pocket knife [the officer] closed his thumb and forefinger around it to see whether it was hard, suggesting a possible knife. Instead of anything hard he felt little chunks in plastic bags which he immediately recognized as drugs. He specifically denied that he moved his finger and thumb back and forth so as to manipulate the package to help identify the contents as drugs.

*Id.* at 1156. We concluded that "such a precautionary squeeze is well within the scope of *Terry,*" specifically noting that the officer "did not seek to manipulate the object, but was nevertheless alerted immediately to the presence of drugs." *Id.* at 1158.[1]

 In *Mattarolo,* we cautioned that, "[h]ad the officer continued to manipulate the object beyond what was necessary to ascertain that it posed no threat, he would have run afoul of the Supreme Court's holding in *Minnesota v. Dickerson.*" *Id.* That is exactly what the officer did here. The officer, in his police report, stated that he immediately "took [Miles] into custody to investigate the crime" and then "began to search his person for evidence." Then, according to the officer's testimony, he felt a small box in Miles's pocket. The box was no bigger than a large package of chewing gum and was one-half the size of a package of cigarettes. While the officer may have been patting down for a weapon, he had reached the outer limits of his patdown authority when it was clear that the object was a small box and could not possibly be a weapon. Unlike in *Mattaro-*

---

1. We reached a similar conclusion even before the Supreme Court decided *Dickerson.* In *Tinney v. Wilson,* 408 F.2d 912, 916 (9th Cir.1969), during a patdown for weapons, the officer "felt only a small object, which clearly was not, in his mind, a potential weapon." Nevertheless, the officer "gently squeez[ed] the object." *Id.* (internal quotation marks omitted). We held that "[w]hile [the officer's]

'frisk' ... for weapons was constitutionally valid at its inception, the officer's 'squeezing' action transgressed the limits of a search which must be 'confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer.' " *Id.* (citation omitted).

*lo,* the officer here did not immediately recognize the box as contraband. Rather, as in *Dickerson,* "the officer determined that the object was contraband only after 'squeezing . . . and otherwise manipulating the contents of the defendant's pocket.'" 508 U.S. at 378, 113 S.Ct. 2130. At that point, the officer's further manipulation of the box was impermissible. He had no cause to shake or manipulate the tiny box on the pretext that he was still looking for a weapon.

The government suggests that the officer might legitimately have been looking for a tiny pen knife, needle, or other slender weapon. But the officer did not testify to such a motivation. Under the government's logic there would be no limit to the bounds of a *Terry* stop. Rather, looking for the proverbial "needle in a haystack" would become the norm. "Shake, rattle, and roll" would take on new meaning in the context of a *Terry* patdown. It must also be remembered that this search took place while Miles was handcuffed. Having already used significant force to secure the scene for safety purposes, the officers cannot leverage the safety rationale into a justification for a full-scale search. The search exceeded the "strictly circumscribed" limits of *Terry.*

### CONCLUSION

Under the circumstances here, the officers' conduct did not exceed the scope of a *Terry* stop when they ordered Miles to his knees at gunpoint and handcuffed him behind his back. They did, however, exceed the scope of a *Terry* patdown by moving or shaking the box in Miles's pocket. Therefore, the motion to suppress should have been granted.

**REVERSED AND REMANDED.**