Chief Judge KOZINSKI,
dissenting:
Two words best describe the majority opinion: “wrong” and “dangerous.” The majority sifts through the facts one by one and finds that none of them justifies the search of I.E.V. But the Supreme Court has rejected this approach. United States v. Arvizu, 534 U.S. 266, 274-75, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). The district court got it right when it found that “[t]he frisk of [I.E.V. and his brother, Mendez,] was warranted based on the totality of the circumstances: the proximity to the border, the canine alert to contraband, the nervous behavior and gestures of Mendez ... and the experience of Officer Cooper[, who directed the frisks,] that often individuals transporting contraband also carry firearms.” (Emphasis added.)
It doesn’t matter whether I.E.V. exhibited the same nervous behavior as his brother. Though “mere propinquity to others independently suspected of criminal activity” isn’t enough, Ybarra v. Illinois, 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), two people riding in the same car in the middle of nowhere can reasonably be presumed to be in cahoots. If one of them gives signs of having a concealed weapon, it’s reasonable to suspect the other might too. See United States v. Berryhill, 445 F.2d 1189, 1193 (9th Cir.1971) (discussing Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)). No officer who values his life would assume otherwise.
Once Officer San Ramon felt a hard object under I.E.V.’s shirt, he was eminently justified in looking to see what it was. See Terry, 392 U.S. at 25-27, 88 S.Ct. 1868; Minnesota v. Dickerson, 508 U.S. 366, 374-76, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993); Berryhill, 445 F.2d at 1192-93. Unlike cases where police felt a small lump, Dickerson, 508 U.S. at 369, 378-79, 113 S.Ct. 2130, or a matchbox-sized container, United States v. Miles, 247 F.3d 1009, 1011-12 (9th Cir.2001), there was a “very large bulky object” taped to I.E.V.’s stomach. Common sense tells us that people engaged in legitimate business don’t tape bricks to their bodies. This would be true even if the encounter had been on a street corner in Pocatello, but at a checkpoint on a highway heading from the Mexican border, after a dog had alerted to possible drugs? Any officer who sent I.E.V. on his way without finding out what he was hiding under his shirt should have been fired for incompetence.
My colleagues ignore these intractable realities and focus instead on irrelevancies. They mention twice (so they must think it’s pretty important) that the dog didn’t alert to weapons. Maj. Op. 436, 439-40 n.6. But the dog did alert to possible illegal activities that are often accompanied by firearms. The majority also mentions twice (ditto) that the dog alerted to possible drugs or humans, as if this matters. Id. at 436, 439-40 n.6. It doesn’t: If the dog alerts to something that might be drugs or humans, that something could be drugs.
The majority mentions three times (ditto!) that I.E.V. and his brother were teenagers, as if that matters. Maj. Op. 435, 436, 439. Teenagers are perfectly capable of carrying drugs and killing people with guns. Teen kills cop, then self, Chicago Tribune (June 20, 2007), available at http://articles.chicagotribune.com/2007-06-20/news/0706200859_l_kills-teen-cop.
*443 The majority mentions four times (DITTO!!!) that San Ramon didn’t testify, Maj. Op. 433, 434, 440-41, 441, and argues that we may not “assum[e] that [he] ‘might legitimately have been looking for’ a weapon,” id. at 440 (quoting Miles, 247 F.3d at 1015). But San Ramon’s actual thought processes are irrelevant; we look at the situation from the point of view of a reasonable officer. See Terry, 392 U.S. at 21-22, 88 S.Ct. 1868. None of the cases the majority cites support the proposition that the searching officer must testify, and it makes no sense. Cooper gave the order to frisk I.E.V. and he testified why he believed I.E.V. was armed. Under the collective knowledge doctrine, San Ramon knew everything Cooper knew. United States v. Ramirez, 473 F.3d 1026, 1033 (9th Cir.2007). From I.E.V.’s testimony, we also know that San Ramon felt a large, bulky object concealed on him that almost certainly was contraband or weapons. The majority doesn’t explain what possible difference San Ramon’s personal narrative would have made.
The majority claims four times (id.) that Cooper’s testimony is “conflicting” or “contradictory,” Maj. Op. 434, 441, but Cooper’s testimony was perfectly consistent. Cooper testified on direct that the large concealed object he felt could have been contraband and also, on cross, that it could have been a weapon. An unknown object could be contraband and could also be a weapon, just as a cat locked in a steel chamber for an hour could be alive and could also be dead.
Because none of this gets the majority where they want to go, they indulge in some appellate fact-finding. According to the majority, the officers didn’t frisk the subjects until the search of the car was pretty much completed, which “demonstrate[s] that, even if [the officers] had a hunch that weapons could be in the area, they did not have the requisite ‘immediate’ need to protect themselves or others from danger.” Maj. Op. 438. But my colleagues overlook I.E.V.’s own testimony:
Q. How long after the dog moved away [from sniffing you] did they-—-did they start to search you?
A. Probably right after.
This is entirely consistent with Officer De-Busk’s testimony:
Q. While you were conducting the canine inspection of the vehicle in secondary, was there at the same time a search being done of the persons of [I.E.V.] and the driver Mr. Mendez?
A. They were interviewing them. And while I was directing my dog in a sniff of the vehicle, they performed a search on the subjects.
Deciding when to frisk suspects is a difficult and sensitive question. We want officers to be safe, but we also don’t want to subject individuals to the indignity and intrusion of a frisk without sufficient cause.- Here, the initial dog alert provided some indication of drugs, and hence gave rise to some suspicion that firearms might be involved, but perhaps not enough. So the officers acted cautiously and didn’t conduct a frisk immediately after the brothers were sent to secondary. But once I.E.V. and Mendez were out of the vehicle, Cooper found an additional reason to worry: “[Mendez] seemed very nervous and continually touched his abdomen area.” That additional observation gave Cooper sufficient cause to conduct a frisk, and he did so right after DeBusk and the dog went to search the car; the frisk was completed, and the marijuana was discovered, while DeBusk’s walk-around of the vehicle was in progress.
The district court never found that the officers unnecessarily delayed in frisking I.E.V. and Mendez; nor did I.E.V. raise *444 the argument below or on appeal. The lackadaisical-search rationale is the majority’s own invention. My colleagues embark on a fact-finding expedition based on a cold record, without any input from the parties, and draw conclusions about the state of mind of the officers conducting the search. Who needs district judges when we can do all that on our own?
But my colleagues create a much bigger problem than merely usurping the district court’s role. The majority’s attempt to wring out of the record some sort of proof that these officers were not really worried about weapons, Maj. Op. 437-39, flies in the face of a solid wall of authority that we must view the situation through the eyes of an objective officer, see, e.g., Terry, 392 U.S. at 21, 88 S.Ct. 1868 (“And in making [the reasonable suspicion] assessment it is imperative that the facts be judged against an objective standard.... ” (emphasis added)); Arvizu, 534 U.S. at 273, 122 S.Ct. 744 (similar); Whren v. United States, 517 U.S. 806, 812-14, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) (“[T]he Fourth Amendment’s concern with ‘reasonableness’ allows certain actions to be taken in certain circumstances, whatever the subjective intent.”).
The Seventh Circuit has expressly rejected the majority’s lackadaisical-search rationale for precisely this reason:
The elapsed time [from the stop to the frisk] is the only evidence Adamson cites in support of his position that the officers were not concerned with their safety at the time of the search. This argument addresses whether the officers, having not immediately patted him down, subjectively believed that he was armed. But reasonable suspicion is measured against the totality of the circumstances, and the test is objective.
United States v. Adamson, 441 F.3d 513, 521 (7th Cir.2006); accord United States v. Barnett, 505 F.3d 637, 639-40 (7th Cir.2007); see also United States v. Menard, 95 F.3d 9, 11 (8th Cir.1996) (recognizing that an officer may have legitimate reasons for delaying a pat-down of a suspect). The majority’s foray into appellate fact-finding puts us on the wrong side of a circuit conflict.
It’s easy enough, sitting safely in our chambers, protected by U.S. Marshals with guns and dogs, surrounded by concrete barriers and security cameras, to say that officers in the field had no cause to fear for their safety. But if we’d been there when I.E.V. and his brother pulled up in their car, heard the police dog alert and seen one of the suspects fidget like he was reaching for a weapon, I’d have dived for cover into the nearest ditch, and my guess is I wouldn’t have been the first one there.