**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee*, v. REGINALD AARON EDWARDS, AKA Baby R-Mac, AKA Arron Reginald Edwards, AKA Reggie Aaron Edwards, AKA Reginald Aron Edwards, AKA Timothy Green, AKA R-Mac, *Defendant-Appellant*. | No. 13-50165 D.C. No. 2:12-cr-00751-GAF-1 OPINION |

Appeal from the United States District Court
for the Central District of California
Gary A. Feess, District Judge, Presiding

Argued and Submitted
May 14, 2014—Pasadena, California

Filed July 31, 2014

Before: John T. Noonan, Jr., Kim McLane Wardlaw
and Raymond C. Fisher, Circuit Judges.

Opinion by Judge Fisher

## SUMMARY[*]

### Criminal Law

The panel affirmed the district court's denial of a suppression motion in a case in which police officers responding to an anonymous 911 call found the defendant in the vicinity of the reported shooting, discovered he matched the description of the reported suspect, stopped him, frisked him, found he had a gun, and arrested him.

The defendant contended that the officers' conduct converted his detention before the gun was discovered from an investigatory stop into an arrest, and that even if the defendant's detention was merely an investigatory stop, the officers did not have reasonable suspicion to stop him. The panel held that the officers properly conducted an investigatory stop and had reasonable suspicion to do so.

### COUNSEL

Sean K. Kennedy, Federal Public Defender, Los Angeles, California; and Davina T. Chen (argued), Glendale, California, for Defendant-Appellant.

André Birotte Jr., United States Attorney, Robert E. Dugdale, Assistant United States Attorney, Chief, Criminal Division, Max B. Shiner (argued), Assistant United States Attorney,

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Violent & Organized Crime Section, Los Angeles, California, for Plaintiff-Appellee.

## OPINION

FISHER, Circuit Judge:

Reginald Aaron Edwards was arrested and charged with being a felon in possession of a firearm after an anonymous caller reported a shooting to a 911 dispatcher. Police officers responding to the 911 call found Edwards in the vicinity of the reported shooting and discovered that he matched the description of the reported suspect. They stopped Edwards, frisked him and found he had a gun, and then arrested him. Edwards conditionally pled guilty and now challenges the district court's denial of his motion to suppress the evidence police obtained when they stopped him. Specifically, Edwards contends that the officers' conduct converted his detention before the gun was discovered from an investigatory stop into an arrest, and that even if Edwards' detention was merely an investigatory stop, the officers did not have reasonable suspicion to stop him. We hold that the officers properly conducted an investigatory stop and had reasonable suspicion to do so.

## I. Background

On May 3, 2012, at 7:40 p.m., the Inglewood Police Department received a 911 call from an unidentified male reporting that a "young black male" at the corner of West Boulevard and Hyde Park Boulevard was shooting at passing cars, including the caller's. The caller provided additional details about the suspect during the five-minute call, telling

the 911 dispatcher that the shooter was between 5 feet 7 inches and 5 feet 9 inches in height and "maybe 19, 20" years old.  The caller initially said that the shooter was wearing "all black" but later clarified that he was wearing a black shirt and gray khaki pants.  The caller also reported that the shooter had a black handgun and, after shooting, was entering "Penny Pincher's Liquor" store.

Police officers Ryan Green and Julian Baksh began receiving information about the call from the dispatcher at 7:42 p.m.  The dispatcher requested that officers "[r]espond to shots fired in the area of Hyde Park and West" and told officers that, according to a reporting party, a black man, "[a]pproximately 5'7" to 5'9" wearing a black sweatshirt and gray khaki pants," was "[w]alking around shooting at passing vehicles" and was now possibly inside Penny Pincher's Liquor.  Green and Baksh arrived on the scene at around 7:45 p.m. and parked two blocks from the shooter's reported location.  After leaving their vehicle, Green and Baksh observed Edwards walking eastbound approximately 75 feet from the liquor store.  Green testified that Edwards matched the description of the suspect reported in the anonymous call.  Edwards is African-American, was 5 feet 11 inches and 26 years old at the time, and was wearing a black, long-sleeve shirt and gray pants.  Green also testified that "[t]here was only one other individual in the area, a male Hispanic, wearing a black and green heavy jacket and blue jeans."

Green notified other police units of Edwards' location, and officers John Ausmus and Landon Poirier quickly responded.  Ausmus and Poirier detained Edwards as well as the "male Hispanic," while Green and Baksh covered them.  All four officers had their weapons drawn as they approached the two men.  Ausmus commanded both men to kneel on the

pavement. Ausmus handcuffed Edwards while he was on his knees, and then stood Edwards up and had him spread his legs. Ausmus began patting down Edwards and felt a hard object above Edwards' right knee, inside the pant leg. Ausmus pulled on the pants to jiggle the item out, and a silver .22-caliber revolver fell out of Edwards' pants and onto the pavement beside Edwards' feet. The 911 dispatcher had a call-back number for the reporting party, and the officers at the scene requested the dispatcher to call back the reporting party. The anonymous caller had already left the scene, however, and did not want to be involved with the case. Thereafter, the officers transported Edwards to the police station.

A grand jury charged Edwards with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Edwards moved to suppress all physical evidence obtained as a result of his initial stop and frisk. After an October 2012 hearing, the district court denied the motion to suppress under *United States v. Terry-Crespo*, 356 F.3d 1170 (9th Cir. 2004), finding that the officers did not need probable cause to detain Edwards because they had reasonable suspicion necessary for the stop. Edwards entered a conditional guilty plea, and the district court sentenced him to 48 months' imprisonment followed by three years' supervised release.

## II. Discussion

### A. Standard of Review

"We review de novo the denial of a motion to suppress." *United States v. Crawford*, 372 F.3d 1048, 1053 (9th Cir. 2004) (en banc). "The determination of whether a seizure exceeds the bounds of [an investigatory] stop and becomes a

*de facto* arrest is reviewed *de novo*." *United States v. Miles*, 247 F.3d 1009, 1012 (9th Cir. 2001) (internal quotation marks omitted). "A determination whether there was reasonable suspicion to support an investigatory 'stop and frisk' is a mixed question of law and fact, also reviewed de novo." *United States v. Burkett*, 612 F.3d 1103, 1106 (9th Cir. 2010).

## B. Edwards' Detention Did Not Amount To An Arrest

Edwards challenges the district court's determination that his detention leading to the discovery of the gun was merely an investigatory stop under *Terry v. Ohio*, 392 U.S. 1 (1968), and not an arrest requiring probable cause.[1] The totality of the circumstances determines whether and when an investigatory stop becomes an arrest. *See Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir. 1996). In looking at the totality of the circumstances, we examine two main components of the detention. *See id.* First is "the intrusiveness of the stop, i.e., the aggressiveness of the police methods and how much the plaintiff's liberty was restricted." *Id.* Under this component, we "review the situation from the perspective of the person seized," assessing whether "a

---

[1] The Supreme Court held in *Terry* that "where a police officer observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot and that the persons with whom he is dealing may be armed and presently dangerous, where in the course of investigating this behavior he identifies himself as a policeman and makes reasonable inquiries, and where nothing in the initial stages of the encounter serves to dispel his reasonable fear for his own or others' safety, he is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing of such persons in an attempt to discover weapons which might be used to assault him." 392 U.S. at 30. Such a search is allowed under the Fourth Amendment, and "any weapons seized may properly be introduced in evidence against the person from whom they were taken." *Id.* at 31.

reasonable innocent person in these circumstances would . . . have felt free to leave after brief questioning." *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1295–96 (9th Cir. 1988). Second is "the justification for the use of such tactics, i.e., whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Lambert*, 98 F.3d at 1185. This "inquiry is undertaken . . . from the perspective of law enforcement," while bearing in mind that "the purpose of a *Terry* stop is to allow the officer to pursue his investigation without fear of violence." *United States v. Guzman-Padilla*, 573 F.3d 865, 884 (9th Cir. 2009) (internal quotation marks and alteration omitted). "The second inquiry frequently proves determinative." *Id.*

Here, there is no doubt that the police were intrusive in stopping Edwards. Four officers pointed their weapons toward him, and he was forced to kneel and was handcuffed before being patted down. *See, e.g.*, *Lambert*, 98 F.3d at 1188 ("[I]f the police draw their guns it greatly increases the seriousness of the stop."); *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir. 1982) ("[H]andcuffing substantially aggravates the intrusiveness of an otherwise routine investigatory detention and is not part of a typical *Terry* stop."). The officers used aggressive methods and restricted Edwards' liberty.

However, as we have repeatedly explained, "because we consider both the inherent danger of the situation and the intrusiveness of the police action, . . . pointing a weapon at a suspect and handcuffing him, or ordering him to lie on the ground, or placing him in a police car will not *automatically* convert an investigatory stop into an arrest that requires probable cause." *Lambert*, 98 F.3d at 1186 (emphasis in original). In *Miles*, officers responded to a report that a black

man wearing an oversized jacket and riding a bicycle had fired a gun at a residence. *See* 247 F.3d at 1010–11. When they found a suspect fitting the description approximately six blocks from the residence and standing in the immediate vicinity of a bicycle, the officers approached the suspect with their guns drawn, ordered him to kneel and handcuffed him. *See id.* at 1011. We concluded these actions were reasonable and this initial stop did not amount to an arrest, given that the officers "had a report of gunfire and had legitimate safety concerns" and "made an on-the-spot assessment of the restraint necessary to control the situation." *Id.* at 1013. Particularly relevant here, we noted that "[w]e have permitted the use of intrusive means to effect a stop where the police have information that the suspect is currently armed or the stop closely follows a violent crime. Under such circumstances, holding a suspect at gunpoint, requiring him to go to his knees or lie down on the ground, and/or handcuffing him will not amount to an arrest." *Id.* (citation omitted).[2]

Here, as in *Miles*, the officers' aggressive conduct was reasonable and did not convert Edwards' detention into an arrest. Edwards was the only person in the vicinity of the liquor store who fairly matched the description of a man who reportedly had been shooting at passing cars just minutes before police arrived. The officers had sufficiently detailed information from the 911 call to reasonably believe that Edwards could be the shooter and therefore could be armed and dangerous, possibly having just committed a violent crime. The officers' legitimate safety concerns justified their

---

[2] *Miles* ultimately held that a motion to suppress should have been granted, but only because the officers violated the limits of a *Terry* patdown. *See* 247 F.3d at 1013–15.

on-the-spot decision to use intrusive measures to stabilize the situation before investigating further. *See id.* at 1013.

## C. The Officers Had Reasonable Suspicion To Stop Edwards

Edwards also disputes that the anonymous 911 call provided the officers with enough information to give them reasonable suspicion to support the investigatory stop in the first place. "The Fourth Amendment permits brief investigative stops . . . when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 134 S. Ct. 1683, 1687 (2014) (internal quotation marks omitted). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Id.* (citations and internal quotation marks omitted). Reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability," and "[t]he standard takes into account the totality of the circumstances – the whole picture." *Id.* (internal quotation marks omitted).

The Supreme Court, in addressing the issue of telephone tips and investigatory stops, has focused on whether the tips "exhibited sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop." *Alabama v. White*, 496 U.S. 325, 326–27 (1990). In *White*, an anonymous caller telephoned a police department reporting that a woman named Vanessa White would be leaving a specific apartment in a specific car at a specific time, on her way to a particular motel and in possession of

cocaine. *See id.* at 327. Officers followed White as she drove in the specified car from the apartment to the motel, and when they stopped her they found marijuana and cocaine. *See id.* The Court held that the anonymous tip exhibited sufficient indicia of reliability to justify the stop, because the caller was able to accurately predict White's future behavior and officers were able to sufficiently corroborate the details of the tip. *See id.* at 330–32.

In contrast, the Court in *Florida v. J.L.*, 529 U.S. 266, 268 (2000), dealt with an anonymous caller who told the police "that a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." Police proceeded to the bus stop, frisked J.L. – who was black and was wearing a plaid shirt – and seized a gun from his pocket. *See id.* The Court held this tip insufficient to justify the investigatory stop. *See id.* at 274. It "lacked the moderate indicia of reliability present in *White* and essential to the Court's decision in that case" because "[t]he anonymous call concerning J.L. provided no predictive information and therefore left the police without means to test the informant's knowledge or credibility." *Id.* at 270–71. The Court explained that the tip leading to J.L.'s arrest was "[a]n accurate description of a subject's readily observable location and appearance" but "d[id] not show that the tipster ha[d] knowledge of concealed criminal activity. . . . [R]easonable suspicion . . . requires that a tip be reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* at 272. The Court also declined to speculate about situations in which "the danger alleged in an anonymous tip might be so great as to justify a search even without a showing of reliability," such as "a report of a person carrying a bomb." *Id.* at 273.

With *J.L.* in mind, we focused our attention in *United States v. Terry-Crespo*, 356 F.3d 1170 (9th Cir. 2004), on the emergency situation that the Supreme Court had declined to reach. In *Terry-Crespo*, a man called 911, identified himself and his general location, and then described in detail a man he said threatened him with a .45-caliber gun three minutes earlier. *See id.* at 1172. An officer stopped Ariel Terry-Crespo as a suspect and found that he had a .45-caliber gun. *See id.* at 1173. We held that the 911 call supported reasonable suspicion justifying the investigatory stop, *see id.* at 1174, for four main reasons: (1) the "call was not anonymous and therefore was entitled to greater reliability," *id.* at 1174; (2) "an emergency 911 call is entitled to greater reliability than an anonymous tip concerning general criminality," *id.* at 1176; (3) "[m]erely calling 911 and having a recorded telephone conversation risks the possibility that the police could trace the call or identify [the caller] by his voice," so the caller "risked any anonymity he might have enjoyed and exposed himself to legal sanction," *id.*; and (4) "the police could place additional reliability on [the caller's] tip because his call evidenced first-hand information from a crime victim laboring under the stress of recent excitement," *id.* at 1176–77.

The district court here relied primarily on *J.L.* and *Terry-Crespo* in its reasoning. However, in the time since the district court issued its decision, the Supreme Court has weighed in on this issue once again, this time addressing an anonymous call about an emergency situation. *See Navarette v. California*, 134 S. Ct. 1683 (2014). In *Navarette,* a 911 caller – assumed by the Court to be anonymous – reported that a vehicle ran her off the road. *See id.* at 1686, 1688. After a dispatcher relayed the tip, which included the nature of the incident and the location and a specific description of

the offending vehicle, officers pulled the vehicle over and found 30 pounds of marijuana. *See id.* at 1686–87. The Court held that the anonymous call provided reasonable suspicion to justify this investigatory stop, *see id.* at 1692, emphasizing four points: (1) the caller claimed eyewitness knowledge of the alleged dangerous activity, lending "significant support to the tip's reliability," *id.* at 1689; (2) the caller made a statement about an event "soon after perceiving that event," which is "especially trustworthy," *id.*; (3) the caller used 911, which "has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity," *id.*; and (4) the caller created reasonable suspicion of an ongoing and dangerous crime – drunk driving – rather than "an isolated episode of past recklessness," *id.* at 1690. The Court distinguished the anonymous call in *Navarette* from the "bare-bones tip" in *J.L.*, "where the tip provided no basis for concluding that the tipster had actually seen the gun" and where "[t]here was no indication that the tip . . . was contemporaneous with the observation of criminal activity or made under the stress of excitement caused by a startling event." *Id.* at 1689, 1692.

In this case, the tip was an anonymous 911 call from an eyewitness reporting an ongoing and dangerous situation and providing a detailed description of a suspect. In light of *Navarette*, we conclude that the anonymous call leading to Edwards' detention exhibited sufficient indicia of reliability to provide the officers with reasonable suspicion. There are several circumstances that lead us to this conclusion.

First, even though we gave weight to the caller's self-identification in *Terry-Crespo*, *see* 356 F.3d at 1174, the Supreme Court's decision in *Navarette* makes explicitly clear

that the "principles" underlying *Terry* stops and reasonable suspicion "apply with full force to investigative stops based on information from *anonymous* tips," 134 S. Ct. at 1688 (emphasis added). It is now clearly established that "under appropriate circumstances, an anonymous tip can demonstrate 'sufficient indicia of reliability to provide reasonable suspicion to make [an] investigative stop.'" *Id.* (alteration in original) (quoting *White*, 496 U.S. at 327).

Second, the anonymous caller here reported an ongoing emergency situation even more dangerous than the suspected drunk driving in *Navarette*. *See id.* at 1691 ("[S]he alleged a specific and dangerous result of the driver's conduct: running another car off the highway. That conduct bears too great a resemblance to paradigmatic manifestations of drunk driving to be dismissed as an isolated example of recklessness."). The call was not simply one "concerning general criminality." *Terry-Crespo*, 356 F.3d at 1176. Rather, the caller said right at the outset of his call that someone was "*shooting* at cars as they [are] going down the street," implying that the shooting was still taking place as he called 911. Such a dire situation distinguishes this case from *J.L.*, which "merely involved a report of general criminality, namely, a minor's possession of a firearm in violation of Florida law." *Id.* (citing *United States v. Holloway*, 290 F.3d 1331, 1339 (11th Cir. 2002)); *see also Holloway*, 290 F.3d at 1338 ("A crucial distinction between *J.L.* and this case is the fact that the investigatory stop in *J.L.* was not based on an emergency situation. This difference was expressly contemplated by *J.L.* . . . .").

Third, the reporting party here had eyewitness knowledge of the shooting. *See Navarette*, 134 S. Ct. at 1689 ("[T]he caller necessarily claimed eyewitness knowledge of the

alleged dangerous driving. That basis of knowledge lends significant support to the tip's reliability."). When asked by the emergency dispatcher whether the shooter hit any vehicles, the caller described part of what he witnessed, explaining that "[h]e didn't hit any vehicles because when he got to mine, it looked like the gun might have jammed but I heard the pow, pow pow." Additionally, at one point during the call, he exclaimed: "Oh, my god." Thus, there are indications that the call also was a "'statement relating to a startling event'" which was "'made while the declarant was under the stress of excitement that it caused,'" lending further credibility to the allegations. *Id.* (quoting Fed. R. Evid. 803(2)); *see also Terry-Crespo*, 356 F.3d at 1176 ("[T]he police could place additional reliability on [the caller's] tip because his call evidenced first-hand information from a crime victim laboring under the stress of recent excitement.").

Fourth, the caller, although anonymous, used the 911 emergency system, also lending further credibility to his allegations. *See Navarette*, 134 S. Ct. at 1689–90 ("A 911 call has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity. . . . Given the foregoing technological and regulatory developments . . . a reasonable officer could conclude that a false tipster would think twice before using such a system."); *Terry-Crespo*, 356 F.3d at 1176 ("Merely calling 911 and having a recorded telephone conversation risks the possibility that the police could trace the call or identify [the caller] by his voice.").

Applying *Navarette* and *Terry-Crespo*, we hold that the officers in this case reasonably relied on the anonymous call in stopping Edwards, as the district court properly found.[3]

### III. Conclusion

The district court properly determined that the officers' conduct did not convert Edwards' detention into an arrest and that they had reasonable suspicion based on the anonymous 911 call to stop Edwards.

**AFFIRMED.**

---

[3] Edwards also contends the 911 dispatcher's knowledge could not be imputed to the officers for purposes of reasonable suspicion, citing *United States v. Colon*, 250 F.3d 130, 134–38 (2d Cir. 2001). *Colon*, however, is factually distinguishable. There, the dispatcher made a brief call for officers to respond, calling the situation a "man with a gun case" and providing a location and short description of the suspect. *Id.* at 132. Here, the officers received much more information from the dispatcher, including statements specifying exactly which information came from the reporting party, the suspect's possible locations, a full description of the suspect, a full description of the incident and updates as the reporting party provided new information. Thus, the officers had enough information to assess what was happening during this ongoing emergency; they did not have to rely on imputed knowledge.